### BEAL, Receiver, *v.* CITY OF SOMERVILLE.

*(Circuit Court of Appeals, First Circuit.  May 5, 1892.)*

**BANKS AND BANKING—CHECKS FOR COLLECTION—INSOLVENCY.**

  A city treasurer deposited checks in a bank, indorsed by him "For deposit," and the checks were immediately credited to him on his pass book, though not in pursuance of any agreement to that effect. He had been a depositor in the bank for some years, but had no agreement that his checks should be treated as cash, or that he should draw against them before collection. The bank became insolvent before the checks were collected, and their proceeds passed into the hands of a receiver. *Held,* that no title passed to the bank except as a bailee, and that the depositor was entitled to the proceeds. 49 Fed. Rep. 790, affirmed.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

Suit by the city of Somerville against Thomas P. Beal, receiver of the Maverick National Bank, to recover the proceeds of certain checks. From a final decree for plaintiff, defendant appeals. Affirmed.

The allegations of the bill were, in substance, as follows:

(1) On Saturday, October 31, 1891, about a quarter before 3 o'clock in the afternoon, the treasurer of the city of Somerville deposited in the Maverick National Bank, in the name and on account of said city, checks on different banks, amounting to $21,171.40. (2) The treasurer handed the checks, with other deposits, to the receiving teller, with a deposit ticket, and also his pass book, and the teller at once credited the total amount of the deposit therein. (3) Each of said checks had stamped on its back the following: "For deposit. JOHN F. COLE, Treas. & Coll. City of Somerville." (4) After the bank closed its doors on that day, the books of the bank, according to the usual custom, were posted and balanced, and the amount of said checks were placed to the credit of said city, and the checks placed in the clearing house drawer, with other checks intended for presentation at the clearing house on the following Monday. (5) At the time said checks were received by the bank it was irretrievably insolvent, and made so by the operations of the president and two of the directors. It closed its doors at 3 o'clock on said Saturday, and never resumed business. On the following day (Sunday) it was declared insolvent, and the bank examiner took possession of it, and all its assets and property were held by the examiner until the appointment of said receiver. (6) On said Monday the bank examiner caused the checks to be sent to the clearing house, where they were paid, and the proceeds thereof were transferred to and are held by the receiver, separate from other funds. (7) The treasurer had for several years made deposits with the bank without any special agreement in regard thereto. There was no agreement that checks deposited should be considered as cash, or that the treasurer could draw against them before collection. The treasurer never drew a check for which his deposit was not sufficient without counting the proceeds of uncollected checks, except in a few instances, on a few occasions, by special arrangement with the bank. There was no express understanding that the checks should be credited to the city immediately on deposit, but they were always so credited on the pass book at the time of the deposit; and the treasurer did not know whether the books of the bank were balanced after the close of business on each day, and credits given on the books of the bank for checks deposited on that day, but he did know that the amount of such checks was at once credited to him on his pass book. (8) The bank, in balancing its books at the close of each day's business, credited deposits on that day at their face value, without discount; and it was the custom of the bank, on any of such checks being returned from the clearing house uncollected, forthwith to charge off to such depositor the amount of such check, and thus cancel the credit. (9) It was the practice of the Maverick and the other banks in Boston, in some cases, to allow depositors to draw against checks deposited before such checks are collected, and in some cases not, depending upon the bank's opinion of the reliability of the depositor and the makers of the checks. (10) The treasurer, at the time of making said deposit, believed the bank was solvent, and had no knowledge or means of knowing its insolvency.

A demurrer to the bill was overruled, (49 Fed. Rep. 790,) and afterwards the case was heard by agreement on the facts stated in the bill, and the further agreed fact "that the officers of the bank had no knowledge of the insolvency of the bank at the time the deposits were made, unless such knowledge is to be inferred as a matter of law from the facts stated in the bill;" and a final decree for plaintiff was rendered thereon.

*Hutchins & Wheeler*, (*Edward W. Hutchins, Henry Wheeler*, and *Frank D. Allen*, of counsel,) for appellant.

*Selwyn Z. Bowman*, for appellee.

Before PUTNAM, Circuit Judge, and NELSON and CARPENTER, District Judges.

PUTNAM, Circuit Judge. The conclusion of the circuit court in this case was consonant with justice, and it is therefore gratifying that this court finds that the law requires its affirmance. The transaction was primarily a deposit of the checks, with, secondarily, a duty to be performed concerning them by the Maverick National Bank. The fact that the checks were expressly indorsed "For deposit" does not change the nature of what occurred in this instance, as there are no intervening equities, although it emphasizes it. The paying of actual money by a customer into a bank of deposit does not create a bailment, because, by the settled custom, recognized by the supreme court of the United States, the house of lords, and numerous other courts, the bank is authorized to mingle the money at once with its general fund, creating immediately the relation of debtor and creditor, subject by further custom to draft in the usual course of business. But, with reference to the checks claimed by the city of Somerville, the word by which the transaction is ordinarily described may conveniently have, and therefore should have, its full natural force and meaning. A mere deposit would only require a bank to keep; but a usage requiring the Maverick to do in this case something more has continued so long, and is so notorious and universal, that the law can take judicial notice of it, and it happens that its terms and limitations cannot be mistaken. The bank must use due diligence to collect; and, as collections are completed, the bank no longer holds the avails as bailee, but is authorized to mingle them with its other funds, and thus constitute itself a debtor. This, of course, makes the entire transaction something more than a mere deposit, in any proper sense; but this word well gives color to all that follows, and converts all that is done between the customer and the bank, to and including the actual turning of the checks into money, into *locatio operis,* according to its meaning as explained by Judge Story in his work on Bailments, c. 6, art. 2. Aside from the right of the bank to constitute itself a debtor from the time the checks are converted into cash, or its equivalent, instead of a mere trustee or agent, no qualification of the strict legal relations created by a bailment is deducible from the general nature of the transaction, the terms in which it is expressed, or the settled custom, or is shown by the appellant.

It rests on the appellant to support affirmatively his claim to such departure from the ordinary rules which the law applies to a deposit or other bailment, as is covered by his proposition that the bank from the instant of the deposit became a debtor for the amount of the checks, or their general owner, either with or without a right of return in the event of inability to collect. Such a position would reverse all the principles applicable to the simple transaction of a deposit, or other bailment, and cannot be sustained except by evidence of a special agreement, or of such practice or custom as would be equivalent thereto. If appellant showed that the city had a legal right to draw against the checks from the instant of their deposit, so absolute that the bank could not lawfully suspend it by notice or otherwise, pending their collection, this would tend to support his position throughout. But

the ninth paragraph of the bill, which is admitted and is relied on by the appellant, weighs against him. Appellant is in error in discussing this paragraph as though it bore on a custom, in any proper sense of the word, which the city is holden to prove. As alleged, it relates to a practice of some banks which may or may not apply to them all, and which is sufficient in this case if it applies to the Maverick. The practice, as alleged, is like any course of action by which a corporation or individual indicates that an option is reserved. If the paragraph admitted in terms that the practice had been acquiesced in by the city, or generally by the customers of the Maverick, it would show conclusively an option on the part of the bank wholly inconsistent with any theory except that of bailment. As it stands, its weight, although not very great, is necessarily against the appellant. The first impression coming from the fact that the deposit was immediately entered to the credit of the city on its pass book favors the view of the appellant; but a careful consideration will demonstrate that this was a mere matter of convenience, and the entry would have been the same on either theory, as was illustrated in *Manufacturers' Nat. Bank* v. *Continental Bank*, 148 Mass. 553, 20 N. E. Rep. 193, and *Railway Co.* v. *Johnston*, 133 U. S. 566, 10 Sup. Ct. Rep. 390. On the other hand, the appellant fails to show that the city had an absolute right to check against the deposit as soon as made, irrevocable by notice from the bank; and that such right did not exist must be received by this court as a matter of judicial knowledge, notwithstanding the parties in *Moors* v. *Goddard*, 147 Mass. 287, 17 N. E. Rep. 532, and the complainant in this case, seem to have regarded it necessary to prove the practice of a particular bank with reference to this matter. This is inconsistent with any theory except that the bank is a bailee of deposited checks until they are collected; as is also the admitted fact that the bank is entitled to return to its customer an uncollectible check, though he neither indorses it nor gives any special agreement to that effect. The appellant fails to show any obligation to receive back such checks, except what arises from the nature of the transaction, unless from special custom; and it is more in harmony with fundamental principles to presume that this right to return grows out of the former than the latter. It strains the law to convert the natural incidents of a bailment into a right of an entirely different character, to be sustained, if at all, by a custom violative of the ordinary rules governing analogous transactions. No authorities have been cited or found which bind this court to the contrary of what is hereinbefore expressed. *Railway Co.* v. *Johnston*, 133 U. S. 566, 10 Sup. Ct. Rep. 390, is not in point, as the paper in question in that case was not a check, but a sight draft, and the decision was made to rest mainly on the ground of fraud, as was stated by the learned judge from whose decree in the circuit court this appeal was taken. *Ex parte Richdale*, 19 Ch. Div. 409, is criticized in *Balbach* v. *Frelinghuysen*, 15 Fed. Rep. 675. It can be added to what is there said that, so far as the case touches this at bar, the different judges who sat in the court of appeal used essentially varying expressions, all of which were unnecessary, beyond the proposition that the

banker there in question was, under the special circumstances, a holder for value. *Bank* v. *Loyd*, 90 N. Y. 530, so much relied on as establishing an absolute title in the bank from the instant the checks were deposited, may perhaps settle the law for the state of New York. It apparently was so considered by Judge WALLACE as late as 1886, as stated in *Railway Co.* v. *Johnston*, 27 Fed. Rep. 243. The law of New York was especially found by the supreme court of Massachusetts to be as stated in *Bank* v. *Loyd*, in *Brooks* v. *Bigelow*, 142 Mass. 6, 6 N. E. Rep. 766, and though perhaps not of importance, yet it is noteworthy that the parties deemed it necessary to prove the rule of that state as though local and peculiar, and not to be gathered from the common law. *Bank* v. *Loyd* is discussed by the supreme court in *Railway Co.* v. *Johnston*, already cited; and its effect is stated (page 575, 133 U. S., and page 392, 10 Sup. Ct. Rep.,) to be in substance that a transfer by a bank of a draft deposited for collection, and indorsed generally, would confer title by reason of "reputed ownership." This was the pith of the New York decision; the question being, not as to title between the primary bank and its customer, but between the latter and another bank to which the draft had been remitted. *Bank* v. *Hubbell*, 22 N. E. Rep. 1031, 117 N. Y. 384, (decided November 26, 1889,) can be distinguished from the case at bar only by the fact that in the former the checks were expressly indorsed "For collection." They were charged by the depositor to the banker simultaneously with forwarding them, and were in like manner credited at once on reception and before collection, and such as were protested were charged back. The banker did not keep the proceeds of the collections distinct, nor remit them specifically; but they were mingled with his other funds, and remittances of balances were made each week. These covered the existing credits on the books of the banker, whether or not at that time collected. This method of business had continued for many years. Notwithstanding the checks were indorsed specially "For collection," the transactions as a whole were identical in substance with those usual in connection with a deposit as made in the case at bar; and the course of proceedings and the practical construction given them by the parties were precisely the same as though the checks had been indorsed generally. The special indorsements effected nothing, except to give notice to a transferee or other stranger. They were covered into the transactions, and added nothing to them; because checks delivered a banker are "for collection" in any view. The checks were accompanied with letters stating that they were inclosed "for collection and credit." The court said that this amounted to a direction to credit after the collection; but the practice was to credit before, so that the letters of advice were thus actually superseded. Moreover, as already said about the word "collection," the word "credit" added nothing, and was covered into the transactions, because the banker would do this in any event, unless instructed to remit specially. In this case the court of appeals held that the title to the checks remained in the depositor while they were uncollected. In *Balbach* v. *Frelinghuysen*, already cited, the United States circuit court for the district of

New Jersey laid down as the result of its considerations the rule that a bank is, until collection, a bailee of checks deposited, or agent of its customers depositing.    Morse, Banks, (3d Ed.) § 187, says:

"The best opinion is that checks on the depositary, credited as cash, form a general deposit, in the absence of agreement or usage to the contrary, and that other paper credited as cash is also received on general deposit, subject to the right of the bank to cancel the credit if the paper is dishonored without its fault."

Section 586 says:

"When a customer deposits a check on another bank, without any special contract, the property remains in him, and the bank is his agent until it has notice that the correspondent bank has received the money and credited it."

There are many *dicta* and general expressions touching this matter, some of which had in view the solving of other issues, and some of which were built up from the first class without recognizing the method of its origin.    So far as this appeal is concerned, this court must maintain itself as a tribunal of final jurisdiction, notwithstanding the possibility that the case may in some form reach the supreme court.    If we had a determination in point from that court, it would necessarily conclude us; and, if the question at issue had been met by the United States circuit court of appeals in any other circuit, we should, of course, lean strongly to harmonize with it; but we are obliged to proceed without either. Although, whenever the law is very doubtful, or the propositions complicated, this court may derive great aid from *dicta*, expressions of learned judges or text writers, or decisions of local tribunals, it cannot permit itself to be bound or embarrassed by them, when the facts naturally and easily lead to such just conclusions as we now seem required to accept. We do not find it necessary to consider the other propositions involved in the case.    The decree of the circuit court is affirmed, with costs.