## GOSHORN v. MURRAY.

(District Court, W. D. Pennsylvania. July 19, 1912.)

### No. 57.

1. BANKS AND BANKING (§ 167*)—INSOLVENCY—DEPOSITS—CHECKS—RELATION OF BANK.

Where complainant deposited a number of checks and vouchers payable to him in a bank, duly indorsed in blank, and the bank credited plaintiff's account with the amount thereof, but there was no agreement that complainant might draw against them until they were collected, and

---

the bank was notified thereof, the bank, prior to such collection and notice, did not become the debtor of complainant but was a mere agent to collect, and having passed into the hands of the Comptroller of the Currency before notice by other banks to which the items were sent for collection that the collections had been made and the proceeds credited to the insolvent bank's account, and the proceeds of the collections having been thereafter paid to the bank's receiver, complainant was entitled to recover the same as a trust fund from the receiver.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 579–582; Dec. Dig. § 167.*

Right to proceeds of collection on insolvency of collecting bank, see note to Western German Bank v. Norvell, 69 C. C. A. 333.]

**2. BANKS AND BANKING (§ 285*)—INSOLVENCY—KNOWLEDGE BY OFFICERS—RECEIPT OF DEPOSITS.**

Evidence *held* insufficient to show that the officers of a national bank had knowledge that the bank was irretrievably insolvent at the time the bank accepted a deposit of certain checks and vouchers from complainant.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1088; Dec. Dig. § 285.*]

In Equity. Suit by L. R. Goshorn against Charles C. Murray, receiver of the Cosmopolitan National Bank. On final hearing. Decree for complainant.

Lyon & Hunter, of Pittsburgh, Pa., for complainant.
John S. Wendt, of Pittsburgh, Pa., for defendant.

YOUNG, District Judge. This is a final hearing upon a bill in equity filed by L. R. Goshorn against Charles C. Murray, receiver of the Cosmopolitan National Bank, alleging that complainant was the collector of delinquent taxes for the city of Pittsburgh, and that on September 3, 1908, there came into his possession certain checks and vouchers payable to him for taxes, which he deposited on that day with the Cosmopolitan National Bank, aggregating $96,747.27, and which said checks and vouchers were the same day forwarded for collection by said bank to the Third National Bank of Philadelphia to the amount of $50,363.17, and to the Southwark National Bank of Philadelphia to the amount of $46,384.10; that on the 4th or 5th of September all of said checks and vouchers were paid to the said Third National Bank and Southwark National Bank, and the proceeds thereof credited to the Cosmopolitan National Bank; that at the time of said deposit by complainant the Cosmopolitan National Bank was insolvent within the knowledge of its directors and officers, but its insolvency was not known to complainant; that on September 5th, or prior thereto, the Comptroller of the Treasury appointed Robert Lyons receiver of said Cosmopolitan National Bank, who took possession of said bank and its assets on September 5th, and no business was transacted by said bank on September 5th or thereafter; that the proceeds of said checks and vouchers collected by said Third National Bank to the amount of $50,363.17 were paid subsequent to September 5th to said receiver, and the proceeds of the checks and vouchers collected by said Southwark National Bank to the amount of $36,384.10 were paid subsequent to September 5th to said receiver, and, together, increased

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

the funds in the hands of said receiver by the sum of $96,747.27. The prayer of the bill is that the receiver be ordered to pay the complainant said sum of $96,747.27 and for general relief.

The evidence in this case clearly establishes these facts:

First. The complainant deposited on September 3, 1908, with the Cosmopolitan National Bank checks and vouchers given to him in payment of taxes to the amount of $96,747.27 by delivering said checks and vouchers over the counter of the bank to the bank's receiving teller with his, complainant's, indorsement in blank upon them.

Second. That upon the deposit of the checks and vouchers the general deposit account of the complainant as L. R. Goshorn, collector, was credited with the amount of said checks and vouchers on the books of the bank.

Third. That the custom between complainant and the Cosmopolitan National Bank was for complainant to draw checks against his account on the 20th or 21st of each month, and never exceeding the balance shown by the books of the bank one or two days before the date of the draft.

Fourth. That on September 3d of the checks and vouchers deposited by complainant there was forwarded to the Third National Bank of Philadelphia for collection $50,363.17, and to the Southwark National Bank of Philadelphia for collection $46,384.10.

Fifth. That on September 4th the Third National Bank and the Southwark National Bank of Philadelphia received the checks and vouchers, collected the same from the payees thereof, and credited the checks and vouchers or the proceeds thereof, respectively, to the general deposit account of the Cosmopolitan National Bank.

Sixth. That the Cosmopolitan National Bank did not open for business on September 5th, the National Bank Examiner being in charge, and on the same day the receiver was appointed by the Comptroller of the Treasury.

Seventh. That the Third National Bank and the Southwark National Bank of Philadelphia did not remit the amount of their collections of the complainant's checks and vouchers to the Cosmopolitan National Bank, nor inform that bank that the collection had been made and credit given.

Eighth. That some time after September 5th the Third National Bank and the Southwark National Bank of Philadelphia transmitted to the receiver the amounts of money collected by them on the complainant's checks and vouchers amounting to $95,525.33 as the direct proceeds of these collections.

Ninth. The complainant has received on account of this sum from the receiver dividends to the amount of 85 per cent., leaving a balance of $14,328.30.

Tenth. That the Cosmopolitan National Bank was insolvent at the time the deposits were made by the complainant.

Eleventh. That the directors of the Cosmopolitan National Bank did not know that the bank was irretrievably insolvent at the time the deposit was made by complainant.

Twelfth. Richardson, the cashier of the bank, and the other officers

did not know at the time the deposit was made that the Cosmopolitan National Bank was irretrievably insolvent.

[1] Under these facts the first question which arises is, What was the relation of the Cosmopolitan National Bank to the complainant? (a) Was it that of principal and agent, or (b) that of debtor and creditor? We think the true rule as to the deposit of checks and drafts by a depositor as distinguished from money is laid down in Beal v. City of Somerville, 50 Fed. 647, 649, 1 C. C. A. 598, 604 (17 L. R. A. 291), in this language by Judge Putnam:

"The transaction was primarily a deposit of the checks, with, secondarily, a duty to be performed concerning them by the Maverick National Bank. The fact that the checks were expressly indorsed, 'For Deposit,' does not change the nature of what occurred in this instance, as there are no intervening equities, although it emphasizes it. The paying of actual money by a customer into a bank of deposit does not create a bailment, because, by the settled custom, recognized by the Supreme Court of the United States, the House of Lords, and numerous other courts, the bank is authorized to mingle the money at once with its general fund, creating immediately the relation of debtor and creditor, subject by further custom to draft in the usual course of business. But, with reference to the checks claimed by the city of Somerville, the word by which the transaction is ordinarily described may conveniently have, and therefore should have, its full natural force and meaning. A mere deposit would only require a bank to keep; but a usage requiring the Maverick to do in this case something more has continued so long, and is so notorious and universal, that the law can take judicial notice of it, and it happens that its terms and limitations cannot be mistaken. The bank must use due diligence to collect; and, as collections are completed, the bank no longer holds the avails as bailee, but is authorized to mingle them with its other funds, and thus constitute itself a debtor. This, of course, makes the entire transaction something more than a mere deposit, in any proper sense; but this word well gives color to all that follows and converts all that is done between the customer and the bank to and including the actual turning of the checks into money, into locatio operis, according to its meaning as explained by Judge Story in his work on Bailments, c. 6, art. 2. Aside from the right of the bank to constitute itself a debtor from the time the checks are converted into cash, or its equivalent, instead of a mere trustee or agent, no qualification of the strict legal relations created by a bailment is deducible from the general nature of the transaction, the terms in which it is expressed, or the settled custom, or is shown by the appellant. It rests on the appellant to support affirmatively his claim to such departure from the ordinary rules which the law applies to a deposit or other bailment, as is covered by his proposition that the bank from the instant of the deposit became a debtor for the amount of the checks, or their general owner, either with or without a right of return in the event of inability to collect. Such a position would reverse all the principles applicable to the simple transaction of a deposit, or other bailment, and cannot be sustained except by evidence of a special agreement, or of such practice or custom as would be equivalent thereto. If appellant showed that the city had a legal right to draw against the checks from the instant of their deposit, so absolute that the bank could not lawfully suspend it by notice or otherwise, pending their collection, this would tend to support his position throughout."

To the same effect is St. Louis, etc., Railway Co. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390, 33 L. Ed. 683. In Morris on Banks, § 586, the rule is thus stated:

"When the customer deposits a check on another bank without any special contract, the property remains in him, and the bank is his agent until it has notice that the correspondent bank has received the money and credited it."

We have carefully examined all the cases presented to us by the respective counsel, and concluded that the weight of authority establishes this as the true rule: That, in the absence of a special contract, the property in checks or drafts on depositories other than the one in which the deposit is made by the owner of the checks and drafts remains in such owner until collection is made, credit entered and notice given of such credit to the depository receiving such checks or drafts from the owner. Under this rule, it becomes a question of fact rather than of law for the court. St. Louis, etc., Railway Co. v. Johnston, supra.

As we have found the facts, there can be no question of how to apply the rule. The deposit was made in the Cosmopolitan National Bank by the complainant as owner of the checks and vouchers on September 3d and credit given to the complainant in his general deposit account on the same day. The checks and vouchers were forwarded on September 3d to the Philadelphia banks for collection. They were received on September 4th, and the same day credited to the general deposit account of the Cosmopolitan National Bank. On September 5th the bank was not open. The receiver was in charge. The fact that the checks and vouchers were indorsed in blank does not affect the case, nor alter the rule that there must be evidence showing that the deposit was intended to be a deposit of money, with the right to check against the same, and perhaps without the right of the depository to charge back uncollected checks or vouchers. Beal v. City of Somerville, supra. There was no such evidence in this case on the part of the receiver. Nothing was said either by the complainant or the servant of the bank receiving the deposit at the time of the deposit. The inferences from the evidence are that it was the practice between the complainant and the bank for the complainant to make such deposits, and not to check upon his account, except on the 20th or 21st of the month, and then only against the balance, shown by the books one or two days before the presentation of the check. It also appears from the evidence that the Cosmopolitan National Bank had a right to charge back checks and drafts which were not on the Cosmopolitan National Bank, if the same were not collected. The evidence also shows, as shown by Exhibits 5 and 6, that these checks and vouchers were sent with a letter containing these words, "Herewith we hand you for collection," and enumerating the items sent. All these are perhaps slight circumstances tending to show that the checks and vouchers were received for collection only and not as a deposit only, but, taken with the fact that there was no testimony tending in the slightest degree to show that the checks and vouchers were received as a deposit of money, the conclusion cannot be avoided that the deposit was for collection and that the Cosmopolitan National Bank was the agent for their collection, and that the relation of debtor and creditor did not obtain between the Cosmopolitan National Bank and the complainant. The Cosmopolitan National Bank then was the agent for the complainant to make the collection, and this relation would continue until the money was collected upon the checks and vouchers and mingled with the funds of the bank. This could not

occur until the collection was made and the credit given to the forwarding bank and notice thereof given to that bank. Until such time, the proceeds of the collection were not available for drafts by the Cosmopolitan National Bank, and could not be regarded as being part of the funds of that bank. The evidence in this case establishes that no drafts were made upon this account during September 3d or 4th, that the collections were made by the Philadelphia banks on the 4th, and on the 4th credited to the Cosmopolitan National Bank, but whether this credit was made by the Philadelphia banks on the receipt of the checks and vouchers before collection, or after collection of them, does not appear. But the crediting of them was not sufficient to terminate the agency and establish the relation of debtor and creditor. As we have argued, it is the passing of the proceeds of collection into the general funds of the bank that establishes that relation. Therefore the further requisite was that the forwarding bank should have notice of the collection so as to make the proceeds available, or that the proceeds should be remitted by the collecting bank and received by the forwarding bank. The evidence does not show that either notice was given or remittance made. The collection was made on the 4th, and that was the last day the bank was open. The agency continued during September 4th, and on the 5th the bank could not receive either notice or remittance, could not terminate its agency, because it was in the hands of a receiver. There never was, so far as the evidence shows, any commingling of the proceeds of collection with the funds of the bank, and this to my mind is the test of the termination of the agency and the establishing of the relation of debtor and creditor between the Cosmopolitan National Bank and the complainant. The evidence shows that the Philadelphia banks transmitted to the receiver the proceeds of the collection of complainant's checks and vouchers; that they are clearly to the amount of $95,525.-33, the proceeds of complainant's checks and vouchers, clearly distinguishable from the other moneys of the Cosmopolitan National Bank and definitely ear-marked as complainant's money, and are therefore now held by the present receiver, Charles C. Murray, successor to Robert Lyons, as custodian, the same having been received by Lyons, receiver, for the Cosmopolitan National Bank as agent for the complainant. There is no equity in this money in any other person, and, having been clearly identified, it must go to the complainant.

[2] This would dispose of the case, but as the bill has alleged that the deposit was accepted by the Cosmopolitan National Bank when insolvent to the knowledge of the officers and directors of that bank, which was a fraud upon the complainant, he being ignorant of the bank's insolvency, and, as it has been argued at length both in oral and written briefs by counsel for both the complainant and the receiver upon the large amount of evidence submitted upon the two questions of fact as to insolvency and the knowledge thereof by the officers and directors of the Cosmopolitan National Bank, we shall give our conclusions upon these questions so that the reviewing court may have the whole matter before it. A careful examination of the evidence shows that the Cosmopolitan National Bank was insolvent

upon the 3d day of September, 1908. The bank had difficulties with the Comptroller's Department of the Treasury many times during the preceding months, but it does not appear that there was any question of insolvency directly raised, the criticism from the Comptroller being rather in the nature of objections to large loans to certain individuals, firms, and corporations. A careful examination of the evidence reveals the fact that it would have required expert knowledge, the most careful valuation, and very wise prognostication as to the future business and success of those to whom loans were made to determine whether or not the bank was solvent. The officers and to some extent the directors at the different times the letters of the Comptroller criticising these loans were received made investigations, examined the persons representing the loans, and honestly concluded, I think the evidence shows, that the loans were safe and secured. There was room for differences of opinion upon the question of the security of the loans, but that rather appears ex post facto, after the bank had gone into liquidation by the receiver, and, even so, the whole difference between the assets and liabilities now in a bank of $500,000 capital and $100,000 surplus is only $90,000. While we can readily find that the bank was insolvent on September 3, 1908, it can by no means be conclusively said that it was hopelessly and irretrievably insolvent upon that date.

The evidence also reveals the fact that while the directors were careless and foolish in their management of the bank's affairs, and in not giving their attention to its affairs, and in not attending the meetings of the directors as it was their duty to do, and in allowing the affairs of the bank to be managed largely by the cashier, yet we do not find in the evidence that the directors of the bank had knowledge, or ought to have had knowledge, of the insolvency of the bank. We find, on the other hand, that the inference from all the evidence is that the directors did not have knowledge of the insolvency of the bank. This is true, especially when we consider that the directors made honest inquiries into loans when their attention was called to them; that they had not checked out their balances before the receiver was appointed, or that their relation to the bank as to deposits and checks was not altered and many of them had balances to their credit when the receiver was appointed; that they did not sell or attempt to sell their stock in the bank during the period of the now alleged insolvency; that eight of the directors on the 3d of September, 1908, signed a bond in the sum of $75,000 to secure such deposits of money as might be made by complainant. Taking all these things together—the doubt that there might be any deficiency in the assets, any difference except in expert and careful examination of the affairs of the bank between the assets and liabilities; their continued unchanged relation to the bank, their making themselves individually liable on the $75,000 bond —we are forced to the conclusion that the directors did not know the bank was insolvent, much less did they know it was hopelessly and irretrievably insolvent on September 3, 1908. Of the officers of the bank, McClurg, president, Kitzmiller, vice president, and Richardson, cashier, only Richardson's knowledge of the insolvency need

be considered, because what we have concluded as to the directors above includes both McClurg and Kitzmiller, there being nothing in the evidence to indicate that either McClurg or Kitzmiller had or ought to have had any different knowledge of the solvency of the bank than the other directors.

The case of Richardson, the cashier, is somewhat different because he appears by the evidence to have practically had charge of the bank without much interference with the details by the other officers or the directors, and because the evidence shows that he made false entries in the books of the bank to deceive the Comptroller of the Treasury, and because the loans that now appear doubtful were made by him. The most serious matter is the false entries, for we are apt to regard such conduct as showing a doubt in the perpetrator of such a misdemeanor as to solvency and convict him of a desire to deceive for the purpose of covering up insolvency. The evidence shows that these false entries did not affect the solvency of the bank, as testified by Wagner, the bookkeeper of the bank (testimony, 215 et seq.), because the false increase of deposits increased the liabilities. Outside of this fact we do not find that Richardson's knowledge differed from that of the other officers and directors.

After a careful consideration of the evidence in this case, we conclude that, while the bank was insolvent on September 3, 1908, neither the directors nor officers had knowledge of that insolvency, and much less did they know that the bank was hopelessly and irretrievably insolvent, and the acceptance of the checks and vouchers by the bank on September 3d, even though they had been received as a deposit of money and mingled with the bank's funds, both of which facts we have found did not obtain, would not have been a fraud upon the complainant.

We therefore conclude that the complainant is entitled to have from the receiver of the bank the remainder of the proceeds of the checks and vouchers deposited by him with the Cosmopolitan National Bank as his agent for collection on September 3, 1908, and now in the custody of Charles C. Murray as receiver, being the sum of $14,328.30, and that at the time of said deposit on September 3, 1908, the Cosmopolitan National Bank was insolvent, but that the officers and directors of the bank did not have knowledge that it was hopelessly and irretrievably insolvent, and that the officers and directors of the bank were not guilty of fraud in receiving or allowing to be received by the bank's employés the deposit of checks and vouchers made by the complainant on September 3, 1908.

Let a decree in accordance with this opinion be drawn and presented to the court.