## In re SILVER.

### (District Court, N. D. Ohio, E. D. October 2, 1912.)

1. BANKS AND BANKING (§ 75*)—INSOLVENCY—DEPOSITS RECEIVED WHEN INSOLVENT—TRUST.

A private banker, who at the time of making a general assignment was so hopelessly insolvent that his estate in bankruptcy will not pay more than one per cent. on claims of general creditors, was legally chargeable with knowledge of his insolvency on the preceding day, which made his acceptance of deposits on that day fraudulent and impresses a trust on the money received in favor of the depositors where it is traced into the hands of his trustee.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 157; Dec. Dig. § 75.*]

2. MORTGAGES (§ 121*)—MORTGAGE GIVEN AS INDEMNITY—SUBSTITUTION OF OBLIGATION OF MORTGAGEE.

Bankrupt was owner of a private bank which was depository for a school district and had given a surety bond to secure its deposits. Anticipating an increased deposit, the bankrupt applied to the surety company for an additional bond, and as indemnity executed to the company a mortgage on land reciting the execution of the bond by the company and its conditions. The bond was afterward executed and forwarded to the bank for delivery to the board of education, but, not being required at that time, was returned and canceled. At the suggestion of the bank that it would be required later, the mortgage was retained, and on request a few months later the company executed a new bond of the same tenor and recorded the mortgage. It subsequently became liable for and paid in full the amount of such bond, which in the meantime had been renewed. Held that, since the liability incurred was that contemplated by the parties when it was executed, the mortgage did not become functus officio when the first bond was canceled, but remained in force as security for the second bond and its renewal, and that it was entitled to priority

---

over a second mortgage to one who had both actual and constructive notice that it was in existence.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 237–241; Dec. Dig. § 121.*]

3. EVIDENCE (§ 460*)—PAROL EVIDENCE AFFECTING WRITING—IDENTIFICATION OF MORTGAGE WITH OBLIGATION SECURED.

The admission of extrinsic evidence to identify a mortgage with the obligation which it secures is not a violation of the rule that a writing cannot be varied by parol.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2115–2128; Dec. Dig. § 460.*]

In the matter of Thomas H. Silver, bankrupt. On review of orders of referee. Reversed.

G. W. Adams, of Wellsville, Ohio, for petitioners.

Hill & Lones, for trustee.

KILLITS, District Judge. [1] The court has before it three petitions to review in as many matters the findings of the referee and his orders thereon. Taking up first the petitions of Julius Goetz & Co. and Calhoun & Thomas, which may be considered together, the facts pertinent to their issues are as follows: The bankrupt, prior to May 29, 1911, did business in Wellsville, Columbiana county, as a private banker under the title of "Silver Banking Company." Some suggestion was made that this was a partnership; but, if so, it was such in name only, for the interest of the supposed partner of the bankrupt was so questionable and infinitesimal as to be negligible. On that day the bankrupt made a general assignment for creditors, and an examination of his estate discloses the fact that he was so hopelessly insolvent that general creditors will receive hardly more than one per cent. of their claims.

The petitioner, Julius Goetz & Co., on Saturday, the 27th of May, 1911, about noon, deposited with Silver Banking Company the sum of $364, and some time during the evening of that day made a further deposit of $400.18; these deposits being made partly in cash and partly in checks. About 8 o'clock of the same evening, the petitioners, Calhoun & Thomas, deposited with the banking company in cash the sum of $121.30. When the bank closed on Monday, the assignee found something over $1,000 in money among its assets. The applications of these several petitioners to have their claims based on these several deposits treated as preferential, on the theory that to receive their deposits under the circumstances was a fraud upon them, were denied by the referee on this finding of fact which manifestly, from the referee's report, controlled his judgment:

"Seventh. That Thomas H. Silver testifies that he did not know that he was insolvent on the day said deposits were made or that he knew said deposits were made."

A son of Thomas H. Silver was by title the assistant cashier of the bank and in fact, with the consent of his father, who was in poor health, the sole manager of the institution. Unquestionably, whatever

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

knowledge is imputable to him of the bank's condition and its business is chargeable to the bankrupt. We believe the referee is in error in holding that direct and affirmative proof of the knowledge of the bankrupt concerning the bank's condition should have been produced by the petitioners and that for want thereof the disclaimer of such knowledge by the bankrupt should control. Mr. Wigmore, in his valuable work (section 245), observes:

"There are in a broad analysis four kinds of circumstances (events or things) which may point forward to the probability that a given person received a given impression (i. e., obtained knowledge, formed a belief or was made conscious): (1) The direct exposure of the fact to his sense of sight, hearing or the like. (2) The express making of a communication to him. (3) The reputation in the community on the subject, as leading probably to an express communication. (4) The quality of the occurrence as leading either to actual perception by his senses or to an express communication. Throughout all these four modes there run two considerations affecting some modes more strongly than others: (a) The probability that the person received an impression of any fact at all; and (b) the probability that from the particular occurrence he would gain an impression as to the specific fact in question."

We will not further quote from this philosophical discussion, but will be content with the observation that one who was impelled on one day to make an assignment for the benefit of creditors because of an insolvency so hopeless as was the case here must have been in such direct exposure on the previous day to the facts as to have charged him with knowledge of their existence. And the quality of the occurrence on Monday speaks very strongly to the belief that on Saturday the conditions bringing about such occurrence were known to the actors. It is possibly true that, actually speaking, the bankrupt did not know on Saturday that his institution was insolvent, but is beyond the range of probability that his son, the active manager of the institution, was likewise ignorant.

In the case of Parmlee v. Adolph, 28 Ohio St. 10, the court say, on page 20, discussing alleged error in refusing to give a request in an action based upon fraudulent representations:

"This request is based upon the idea that, where a party simply believes in the truth of a representation made by him upon which another parts with his property or rights, he will not be guilty of fraud or gross negligence. This doctrine appears to be sound where the question of the credit of the party recommended is involved, and nothing more. Such recommendations are generally understood to be nothing more than the opinion of those who give them, resting upon common reputation, and the apparent circumstances of the individual recommended, and not upon any examination of his affairs. And it is well known that men who are apparently in good circumstances and credit turn out to be, in reality, insolvent. In such cases, a recommendation of that kind should not be presumed fraudulent because it happens not to be true. But the rule is otherwise where the false representation induces the contract between the parties thereto and enters into it. It is otherwise where the party making the false representations is bound to know the truth of his representations; then mere belief in their truth will not excuse. One is responsible for his belief in case where a prudent person might know the truth of the facts upon which his supposed belief is founded."

We hold then that the facts surrounding this transaction justified petitioners' claim that the bankrupt legally knew of the insolvency of

his business when he received the deposits in question. The implied contract, therefore, which ordinarily arises to create the relation of debtor and creditor when deposits are made in a banking institution never was created, and a trust impressed upon these funds in behalf of these several depositors is the equitable result of these transactions. Railway Co. v. Johnson, 133 U. S. 566, 10 Sup. Ct. 390, 33 L. Ed. 683; City of Philadelphia v. Aldrich (C. C.) 98 Fed. 487; Beal, Receiver, v. City of Somerville, 50 Fed. 647, 1 C. C. A. 598, 17 L. R. A. 291; Wasson v. Hawkins (C. C.) 59 Fed. 233; Massey v. Fisher (C. C.) 62 Fed. 958; Richardson v. New Orleans Debenture Co., 102 Fed. 780, 42 C. C. A. 619, 52 L. R. A. 67; Orme v. Baker, 74 Ohio St. 337, 78 N. E. 439, 113 Am. St. Rep. 968.

The findings and orders of the referee in this behalf are set aside, and an order will be entered establishing as preferred the claims of Julius Goetz & Co. and Calhoun & Thomas.

[2] In May, 1909, the Silver Banking Company undertook to become depositary of the funds of a township school district, and as security therefor bought and furnished a bond in the sum of $5,000 from the Fidelity & Casualty Company of New York. Subsequently it was assumed that the deposit would be in excess of this sum, and an additional bond for $5,000 was solicited from the same surety company to run to the township school board, to secure which second bond the bankrupt offered a mortgage on lands owned by him known as the Hardy Farm. On the 7th of June, 1909, such a mortgage was executed by bankrupt and wife to the Fidelity & Casualty Company, reciting in the defeasance clause that the Fidelity & Casualty Company of New York had executed and delivered a certain surety bond in the sum of $5,000 on behalf of Silver Banking Company to the board of education in question to secure the proper payment and accounting of any funds deposited by said board of education with the banking company, and that this mortgage was executed and delivered to save the surety company harmless from any loss or expense by reason of default in the accounting for funds deposited by the board of education in question.

Upon delivery of this mortgage to the surety company a bond for $5,000 was executed on the 9th of June, 1909, and sent to the Silver Banking Company for delivery to the board of education. It developed, however, that the board of education was not then prepared to deposit with the banking company sums in excess of those secured by the earlier bond, wherefore, within a few days, this second bond so secured by the mortgage in question was returned to the Fidelity & Casualty Company for cancellation by the bankrupt's son, who was managing his banking business, and who explained in his letter that the board of education was not then prepared to make additional deposits to secure which this bond was procured, but that the prospect was that in the fall the board's funds would be increased, at which time security similar to that then returned would be needed, wherefore it was suggested that the Fidelity & Casualty Company retain the mortgage to be used as its indemnity for furnishing the second $5,000 bond.

September 14th, the banking company, having then proffered to it the additional deposits by the board of education, made application to the

surety company for a bond in the sum of $5,000, and proposed that the mortgage being still held by the surety company should stand as security for this new suretyship, as suggested in the letter of Mr. Silver, Jr., in June, when the second bond was returned unused.

The bond was furnished as applied for, and the mortgage was filed for record by the surety company in October, 1909. In May, 1911, upon the assignment by the bankrupt and upon default made upon the bonds, which had been renewed at the expiration of the year, loss in the full amount accrued to the surety company.

A few days prior to the assignment, the bankrupt, his wife joining, mortgaged the same premises to Homer C. Wells to secure a loan of $5,000; the mortgage being recorded prior to the assignment. It is in evidence that the bankrupt applied to one L. C. Wells for a loan and was promised the same from Homer C. Wells, who furnished it, and that the bankrupt at the time when he made the application to L. C. Wells discussed with the latter the fact that the land which he offered as security was incumbered by a mortgage to the Fidelity & Casualty Company in the sum of $5,000 to secure the deposits of the board of education in question.

The issues presented to the referee were: (1) The priority of lien as between Wells and the surety company; and (2) the question raised by the trustee whether the surety company had any lien at all upon the so-called Hardy Farm by virtue of this mortgage. Each of these questions was decided by the referee adversely to the Fidelity & Casualty Company, and they are before us for review of his conclusions.

It is urged in behalf of both Wells and the trustee that this mortgage by its recitation referred unmistakably to a surety bond then executed and that it became satisfied and functus officio, incapable of reissue in the informal way established by the facts, when the bond of June 9, 1909, was returned to the surety company unused and was canceled, and we are referred for authority, among other citations, to the cases of Bogert v. Bliss, 148 N. Y. 194, 42 N. E. 582, 51 Am. St. Rep. 684; Flye v. Berry, 181 Mass. 442, 63 N. E. 1071; 27 Cyc. 1403, and cases cited in support of the proposition; Stone v. Palmer, 166 Ill. 463, 46 N. E. 1080.

Whatever may be the force of these authorities as applied to the facts peculiar to them, we are unable to accept them as controlling in the facts before us. The purpose for which this mortgage was made was made was to secure the Fidelity & Casualty Company suretyship of additional deposits expected to be made with the Silver Banking Company by the board of education. The form in which that suretyship should be contracted is not material so long as the identity of the transaction as it was completed in September is certain with that in contemplation when the mortgage was made in June. That the deposit in September which the Fidelity & Casualty Company was requested to secure with indemnity to it was the deposit in the minds of the parties to the mortgage when it was made in June the facts of this case leave no question.

We have a case that is its parallel in Ohio authority. In Patterson v. Johnson, 7 Ohio, 225, pt. 1, the mortgage was given to secure in-

208 F.—51

dorsers upon a note stated in the condition of the mortgage to be "a note for the sum of $500.00 indorsed by them, payable at the Washington branch of the Bank of Philadelphia." The facts showed that, as in the case before us, while the instrument upon which the indorsers secured by the mortgage had become obligated was actually executed, it had never been used to ripen the obligation of the indorsers and had been destroyed, so that, as in the case at bar, the identical condition of the mortgage recited in the defeasance clause of the mortgage had never been fulfilled. It follows that if in this case the mortgage became functus officio because the bond of June 9th was returned and canceled, so in that case the mortgage became dead because no note, as described in the defeasance clause, ever ripened into an obligation of the mortgagee. However, another note made by the same parties for the same sum was executed and presented and discounted at another bank, and, being unpaid, subsequently the mortgagees were compelled to pay it. The issue, so far as it concerns us in this case, was between the mortgagees and subsequent lienholders who took chargeable with constructive notice through the recording of the mortgage in question. The court say:

"An attempt is made to invalidate the mortgages by denying the right of the mortgagee to apply it to a purpose different from that expressed on its face, viz., to secure the payment of a note at the bank at Washington, which was never incurred. If a person had been misled by this description, and after due inquiry had advanced money upon, or acquired an interest in this specific land, in the confidence of the nonexistence of such a lien, perhaps his rights might be preferred; but a mere general incumbrancer, if he acquires no paramount legal right, occupies the position of the debtor, and holds his interests subject to all the equities which may be exacted against him. It is evident, in this case, that the grantor of this deed intended it as a protection to his indorsers for their responsibility, upon a contemplated loan for $500; it is permitted in equity to trace this debt in 'favor of securities wherever contracted, and under any form it may assume in the usages of business, and attach the security to it. 4 Johns. Ch. [N. Y.] 65, 8 Am. Dec. 538. The judgment creditor has no reason to complain of rights infringed by this rule, for the mortgage transferred the legal estate and defined the extent of the burden it imposed upon the land. * * * It was, then, of no moment to the later incumbrancers who held this lien, so long as it did not transcend the original amount."

The case of Brinckerhoff v. Lansing, 4 Johns. Ch. (N. Y.) 65, 8 Am. Dec. 538, the case cited by the court in the quotation just made, fully sustains the opinion of the Supreme Court of Ohio upon facts much more favorable to the contention of the trustee and Wells than exist either in the case before us or the case just cited, and is authority for the principle, that maintains to this day with undiminished force, that when a mortgage is made to secure a debt or obligation it may stand unimpaired as such security for such debt or obligation in whatever form the latter may take, so long as its identity as a lineal successor to the original transaction is unmistakable. 27 Cyc. 1053, 1075.

The case of Patterson v. Johnson is still the law of Ohio. Choteau v. Thompson, 3 Ohio St. 424, 427, in which the opinion is by Thurman, C. J., who announces and concurs in a doctrine more applicable to the situation here than that which he criticises as the opinion of the majority of the same court in the case of Choteau v. Thompson, 2 Ohio

St. 114, which counsel for Wells and the trustee cite. Brown v. National Bank, 44 Ohio St. 269, 274, 6 N. E. 648.

In Shirras v. Caig, 7 Cranch, 34, 51 (3 L. Ed. 260), Chief Justice Marshall uses this language:

"It is true that the real transaction does not appear on the face of the mortgage. The deed purports to secure a debt of £30,000 sterling due to all the mortgagees. It was really intended to secure different sums, due at the time from particular mortgagees, advances afterwards to be made, and liabilities to be incurred to an uncertain amount. It is not to be denied that a deed, which misrepresents the transaction it recites, and the consideration on which it is executed, is liable to suspicion. It must sustain a rigorous examination. It is, certainly, always advisable fairly and plainly to state the truth. But, if, upon investigation, the real transaction shall appear to be fair, though somewhat variant from that which is described, it would seem to be unjust and unprecedented to deprive the person claiming under the deed of his real equitable rights, unless it be in favor of a person who has been, in fact, injured and deceived by the misrepresentation. That cannot have happened in the present case."

So it is here that the fact that the mortgage, dated in June and recorded in October, was held by the mortgagee to secure an obligation dated in September, could have injured no one. So far as the recital in the defeasance clause was a misrepresentation, the fact was harmless. Would anybody question that this mortgage was good had the second bond, the one returned, never been made? We would have had then a situation that is not infrequent of a mortgage made prior to the date of the obligation which it was intended to secure. If counsel's argument against this mortgage as applicable to the bond issued in September is good, because that bond does not meet the description in the defeasance clause, then it would be equally applicable had the bond of June 9th, a date two days later than the date of execution of the mortgage, been actually issued and taken effect. On the face of it, such a position would receive scant consideration in a court of equity; and, in view of the fact that there can be no question but that the bond of September is the culmination of a transaction in which the mortgage of June was an essential part, it seems to us that the situation calls for precisely the same determination had the facts been either that the June bond was not executed or that the September bond had not been executed and the June bond had been delivered to the board of education.

Counsel for the trustee and Wells truly argue on authority by them offered that, inasmuch as the bond of September expired with the year, the renewal in 1910 was a new contract; but, that being so, we must not fail to distinguish between the essential fact of a continuing obligation unchanged in identity and the clothing in which that obligation may be garbed from time to time. The obligation from September, 1910, until May, 1911, was the same obligation which the surety company undertook with the board of education as that shouldered by it in September, 1909, and the authorities already cited, and many which could be cited which the industry of counsel in this case has called to the court's attention, are all to the point that a renewal which takes the form of a new contract does not alter the force of the mortgage lien so long as the identity of the obligation secured remains.

Among the many cases cited by counsel for the surety company supporting this proposition are: Durfee v. Knowles, 50 Hun, 601, 2 N. Y. Supp. 466; Parks v. Frahm, 54 Kan. 676, 39 Pac. 185; Bobbitt v. Flowers, 1 Swan (Tenn.) 511—which are especially in point.

The surety company asks that the mortgage may be reformed so as to express the actual relation between the parties. We do not deem this to be necessary. Very little reformation, if any, seems to us to be possible. In view of the not uncommon practice to have a mortgage antedate the actual execution of the obligation which it secures, the instrument in question can hardly be said to be ambiguous, even as applied to the September bond, and in this proceeding the court may well enforce the rights of the mortgagee without reformation on the principle that a court of equity can treat as done that which should be done. Pomeroy, § 1235; Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865.

[3] Nor is there any force, in our judgment, in the contention of counsel that to allow testimony applying the mortgage to the September bond is to vary by parol a written contract. It is always competent to use extrinsic evidence to identify the mortgage with the obligation which it secures, and that proceeding has never been considered to be a violation of the rule invoked by counsel. Hurd v. Robinson, 11 Ohio St. 232; Jones v. Guarantee & Indemnity Co., 101 U. S. 622, 25 L. Ed. 1030.

It follows that the referee was wrong in avoiding this mortgage, and it is ordered that on the distribution of the assets of the estate an accounting be had with the Fidelity & Casualty Company of the proceeds of the so-called Hardy Farm and the extent of its lien thereon as determined by the mortgage and the loss incurred by it through the default made on the September bond as renewed for the subsequent year. The Fidelity & Casualty Company will also recover its costs out of the proceeds of sale of the Hardy Farm.