# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

SECURITY NAT. BANK OF SIOUX CITY, IOWA, v. OLD NAT. BANK OF BATTLE CREEK, MICH.

(Circuit Court of Appeals, Eighth Circuit. February 22, 1917.)

No. 4688.

1. TRIAL ⊛395(5)—FINDINGS OF FACT—ULTIMATE FACTS.

In an action by the payee of a draft drawn by a bank as a remittance of the amount collected on notes sent by the payee for collection, findings that the drawer accepted checks drawn by an insolvent corporation in favor of the maker of the notes as an unconditional deposit, and not merely for collection, and that the maker and the bank intended that the check drawn by the maker in the bank's favor in payment of the notes should be honored in the usual course, and charged to the account of the maker on the books of the bank, were findings of ultimate facts, which the court was empowered to make.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 931.]

2. APPEAL AND ERROR ⊛987(2)—REVIEW—FINDINGS BY COURT—ACTION AT LAW.

Whether the trial court's findings are supported by the agreed facts and the additional evidence is a question of fact on the weight of the evidence, which, in a trial of an action at law by the court, the national courts are forbidden to review by Const. Amend. 7, and Rev. St. §§ 649, 700 (Comp. St. 1916, §§ 1587, 1668).

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3893.]

3. APPEAL AND ERROR ⊛209(1), 268(1)—PRESENTING QUESTIONS BELOW—EVI-DENCE TO SUPPORT FINDINGS.

The question whether there was any substantial evidence to sustain the findings, which is the only question as to the relation of the evidence to the findings reviewable by a federal appellate court, can be reviewed only when, by motion, objection, or request for a declaration of law, or some like action, it was presented to and decided by the trial court, and an exception to the ruling taken and allowed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1290, 1596, 1604.]

4. BANKS AND BANKING ⊛127—DEPOSIT—CONDITIONAL OR ABSOLUTE DE-POSIT.

A depositor and his bank may agree that checks or drafts on other banks, which he deposits, shall immediately become the property of the bank, or that the bank shall hold them and continue the credit to him only on condition that they are paid in the regular course of business.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 304, 310.]

---

5. BANKS AND BANKING ☞123—DEPOSIT—ABSOLUTE DEPOSIT.

A customer, who deposits checks or drafts on other banks with his bank, which gives him credit in his general account subject to check, thereby transfers the title to the checks or drafts, and renders the bank his debtor to the amount thereof, in the absence of an agreement to the contrary.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 303, 308, 311.]

6. BANKS AND BANKING ☞127—DEPOSITS—ABSOLUTE DEPOSIT—EVIDENCE.

Where four checks on other banks were accepted by the depositor bank and placed to the credit of the depositor, subject to its check, without any special agreement, and the depositor bank honored checks on the account to an amount exceeding the account, aside from the checks deposited in payment of notes held by the bank for collection, which notes it canceled and delivered to the depositor, the checks deposited became the absolute property of the bank, notwithstanding the testimony of the bank officers that they intended to give a credit for them conditioned on payment in due course.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 304, 310.]

7. BANKS AND BANKING ☞142—HONORING CHECKS—ESTOPPEL.

A bank, which honors or pays a check of a depositor in the mistaken belief that his credit is larger than it in fact is, or in the hope or mistaken belief that checks which it has credited to his account will be paid, is estopped as against the owner of the check from revoking or avoiding such payment, since the bank may know the state of its own accounts, which the owner of the check cannot know, and since any other rule would result in intolerable delay, uncertainty, and confusion in commercial transactions.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 410–413.]

8. BANKS AND BANKING ☞163—PAYMENT OF NOTES—ACCEPTANCE OF CHECK OF MAKER.

Where a bank, to whom notes of a depositor have been sent for collection, accepts the depositor's check in payment thereof, cancels the notes, and surrenders them to the depositor, and draws and mails its draft for the proceeds of the notes, less its commission, there is an absolute payment of the notes, which, as against the payee, the bank cannot revoke, so as to be relieved of liability on its draft.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 567–570.]

9. BANKS AND BANKING ☞171(2)—AGENCY FOR COLLECTION—NOTES PAYABLE AT BANK.

When a bank at which notes are payable accepts an agency from the owner to collect them, it is bound to preserve for him every right he would have had, if another party had accepted and performed with reasonable diligence the duty of such agent, and cannot defeat an action on its draft, which could not be defeated by another agent, who had made the collection under similar circumstances.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 598, 607, 608, 613–615.]

In Error to the District Court of the United States for the Northern District of Iowa; Wilbur F. Booth, Judge.

Action by the Old National Bank of Battle Creek, Mich., against

the Security National Bank of Sioux City, Iowa. Judgment for plaintiff, and defendant brings error. Affirmed.

This is an action by the Old National Bank of Battle Creek, Mich., against the Security National Bank of Sioux City, Iowa, on the latter's draft in favor of the former for $4,670.37 on the Continental & Commercial National Bank of Chicago, which was issued and mailed to the plaintiff on August 1, 1913, was duly presented for payment and protested, but never paid, and the action resulted in a judgment for the drawee for the amount of the draft, interest, and costs. The defense was that the draft had been issued and mailed to the plaintiff by the Security Bank for the purpose of transmitting to the plaintiff the proceeds of the collection of 4 promissory notes made by the Western Implement Company, a partnership, in business at Sioux City, payable to the order of the Michigan Buggy Company, a corporation of Michigan, indorsed by the latter, discounted by the plaintiff, and sent by it to the Security Bank, at which they were payable, for collection. The case was tried by the court under a stipulation that the jury was waived, that the statement embodied in the stipulation was "a statement of all the facts material to the issues involved in the case," that the court might make special findings which should embody the facts stipulated, "and also such material facts as the court may find from the testimony of certain witnesses." The court made 33 special findings of fact. It is conceded that the first 31 are sustained by the agreed facts; the thirty-second and thirty-third findings are challenged, on the ground that they are not supported by the stipulation and the evidence, and upon this ground, and upon the ground that the findings of facts are insufficient to sustain the judgment, a reversal is sought. Laying aside the 2 findings assailed, the first 31 disclose these facts:

The Michigan Buggy Company was a corporation manufacturing and selling automobiles, with its principal place of business at Kalamazoo, Mich., and the Western Implement Company was a copartnership selling automobiles and having its principal place of business at Sioux City, Iowa. After March 1, 1913, and until some time in August of that year, it was engaged in receiving, on consignment from the Michigan Company, automobiles for sale by it. About March 1, 1913, the Implement Company made and delivered to the Michigan Buggy Company its 4 promissory notes, aggregating $4,675.07, payable to the order of that company, at the Security Bank, on August 1, 1913. These notes were made and delivered by the Implement Company, without consideration, for the accommodation of the Michigan Company; but they were in form regular commercial paper, and none of the parties in interest in this suit, except the Implement Company and the Michigan Company, had any notice that they were accommodation paper until after the transactions which conditioned the rights of the parties to this suit were completed. Prior to July 19, 1913, the Michigan Company indorsed and transferred these notes to the plaintiff, which discounted them in good faith for value. The plaintiff mailed them to the Security Bank for collection, and that bank received them on July 24, 1913. The Implement Company had made like accommodation notes for the Michigan Company to the amount of about $210,000, but neither the plaintiff nor the Security Bank had notice of this fact.

For about three years before August 1, 1913, the Implement Company had been and was a customer of the Security Bank, and as such had been accustomed to deposit with that bank checks of the Michigan Company on other banks, and to receive credit for them by that bank when they were deposited, and all such checks so deposited prior to July 30, 1913, had been paid in the regular course of business. On July 30, 1913, the Michigan Company was insolvent, but none of the other parties to these transactions had any notice of that fact until after the acts which fixed their rights herein had been performed. On July 26, 1913, the Michigan Company sent to the Implement Company 4 checks, aggregating $33,389.38, signed by itself, payable to the order of the Implement Company, 2 on banks in Kalamazoo, Mich., and 2 on banks in New York, with instructions to pay from the proceeds thereof the four notes owned by the plaintiffs and other like accommodation notes that were payable at the Security Bank on August 1, 1913. The Implement Company re-

ceived these checks in the afternoon of July 30, 1913, deposited them to its credit in the Security Bank, which received them, credited them to the Implement Company in its general account, which was subject to checks of the Implement Company, and gave that company its duplicate deposit slip, showing a credit to the Implement Company of the aggregate amount of these checks. On the same day the Security Bank indorsed each of these checks with the words "Prior indorsements guaranteed," and with an order to pay it to the bank to which it sent it, and mailed the 2 checks on the Kalamazoo banks to the National Bank of the Republic at Chicago, and the 2 drawn on New York banks to the National City Bank of New York, for collection.

On the inside cover of the passbook which had theretofore been furnished to the Implement Company, and which it was accustomed to use in making its deposits, was this printed notice: "Notice. Checks, drafts, and other papers received by us on deposit or for collection are taken at the depositor's risk only until we have received actual payment. We assume no responsibility for neglect or default of collecting agents. We reserve the right at our discretion, without liability, to forward items direct to drawee bank for returns." At the time the 4 checks, aggregating $33,389.38, were deposited, the account of the Implement Company showed a credit balance of only $2,074.63, and there were checks outstanding more than sufficient to absorb it. After the deposit of the 4 checks, and the deposit of another item of $4,166.15, and the deduction of a check of $87 paid, there appeared on the books of the bank at the close of business on July 30, 1913, and at the opening of business on July 31, 1913, a credit balance to the Implement Company of $39,543.16. Checks were drawn on this account and deposits made at will by the Implement Company, and on the opening of business on August 1, 1913, there appeared on the books of the bank a credit balance to the Implement Company of $38,269.13. In the absence of the credit of the 4 checks made by the Michigan Company, the Implement Company had not a sufficient balance on the books of the bank to warrant the payment of the 4 notes owned by the plaintiffs, or any like accommodation paper made by the Implement Company, nor had the Implement Company sufficient property to pay its accommodation paper, or any substantial percentage of it.

On August 1, 1913, Mr. Braskamp, one of the members of the partnership the Implement Company, brought into the Security Bank the check of the Implement Company on that bank for $12,932.50 to take up and pay 14 of its accommodation notes due on that day. Mr. Cummings, the assistant cashier of the bank, however, informed him that the bank had 19 such notes for collection, that he (Cummings) had prepared drafts for them, and asked him to give the bank the check of the Implement Company for $20,818.15. Thereupon Mr. Braskamp gave to the bank the check of the Implement Company upon the bank, payable to the bank, for $20,818.15, in payment of the 19 notes, 4 of which were the notes owned by the plaintiff. The bank on receipt thereof believed the Michigan Company's 4 checks had been or would be paid, charged the $20,818.15 to the Implement Company on its books, stamped each of the 19 notes paid, and surrendered them to their maker, the Implement Company. Thereupon the Security Bank took from the proceeds of the 4 notes owned by the plaintiff its usual commission for collection, drew the draft in suit for the balance of the proceeds, and caused it to be mailed to the plaintiff in the usual course of business, some time after 4:30 p. m., on the train from Sioux City to Chicago, due to leave Sioux City at 4:50 p. m. on August 1, 1913. Before the draft was mailed, the books of the bank had been closed for the day, and the transaction had been closed on those books.

There were other accommodation notes of the Implement Company, like those of the plaintiff, in addition to the 19 which it paid with its check for $20,818.15, which were payable at the Security Bank on August 1, 1913, and which the Michigan Company's checks for the $33,389.38 were sent to cover, and the Implement Company on August 1, 1913, made and delivered to the following named banks, respectively, its checks on the Security Bank in payment of some of those notes, to wit: Its check for $943.15, payable to the order of the Iowa State Savings Bank, in payment of 1 such note; its

check for $3,424.63, payable to the order of the Northwestern National Bank, in payment of 3 of such notes; and its check for $1,250.44, payable to the order of the Live Stock National Bank, in payment of 1 such note. All these checks were presented to the Security Bank through the Sioux City clearing house, and were honored and paid by that bank on the 1st day of August, 1913, and at the close of business that day the credit balance of the Implement Company, increased as it had been by the $33,389.38 credit given by the 4 Michigan Company's notes, was reduced by checks of the Implement Company charged against it that the bank had honored to $9,736.99. After the bank had closed, and the draft to the plaintiff had been mailed, and on August 1, 1913, the Security Bank received notice by telegraph that the checks of the Michigan Company on the banks in Kalamazoo were dishonored. Thereupon it took away from the Implement Company the accommodation notes which it had canceled and surrendered to it, caused the 4 notes that had been formerly held by the plaintiff to be protested on August 2, 1913, and then mailed them to the plaintiff, whereupon the latter replied that it considered them paid, and that it held them subject to the order and disposition of the Security Bank. None of the 4 checks of the Michigan Company were ever paid, and that company was adjudged a bankrupt.

The facts which have been recited are derived from the first 31 findings of fact of the court below, and there are no other facts found by it of sufficient materiality to modify or affect the conclusion which the recited facts compel. In the bill of exceptions found in the record there appears, in addition to the stipulation of the agreed facts, the testimony of Mr. Manley, the president of the Security Bank, that he was familiar with the transaction; that he knew that the Implement Company relied upon the 4 checks of the Michigan Company to pay its notes; that the bank relied on the payment of those checks when it honored the check of the Implement Company on it for the $20,818.15, marked its 19 notes paid, and delivered them to their maker; that he never intended the receipt and payment of the check as an absolute payment of the notes; and that he did not intend to extend credit to the Implement Company. There is also found in the bill of exceptions the testimony of Mr. Cummings, the assistant cashier of the bank, who conducted the transaction of the payment of the notes with the proceeds of the check for $20,818.15, that he did not personally receive the 4 checks of the Michigan Company for the $33,389.38, that he had in the past received instructions not to extend credit to the Implement Company, that when he received the $20,818.15 he knew of the previous deposit of the 4 checks of the Michigan Company, and that they relied for absolute payment of the notes surrendered to the Implement Company that day upon the payment of the checks of the Michigan Company.

The thirty-second and thirty-third findings of fact made by the court below, which are challenged by counsel for the Security Bank, were these:

"(32) That the 4 checks received from the Michigan Buggy Company which were placed in the defendant bank July 30, 1913, by the Western Implement Company, as set forth in findings 8 and 9, were placed there as a deposit and received by said bank as a deposit, and that it was the intention and understanding of both the Western Implement Company and the defendant bank at that time that said deposit was not for collection merely, but was unconditional and subject to check by the Western Implement Company.

"(33) That the drawing of the check for $20,818.15 by the Western Implement Company on the defendant bank August 1, 1913, and the delivery thereof to said bank, and the receipt thereof by said bank, as set forth in finding 17, were all done with the intention and understanding, on the part of both said Western Implement Company and said bank, that said bank should honor said check in usual course, should charge the same to the account of the Western Implement Company, and out of the moneys then standing to the unconditional credit of said Western Implement Company on the books of the bank, said bank should pay the notes of the Western Implement Company then in the hands of the defendant bank for collection, including the notes sent by the plaintiff bank."

George C. Scott and John R. Carter, both of Sioux City, Iowa (Wm. Milchrist, H. W. Pitkin, H. W. Brackney, and Homer B. Carter, all of Sioux City, Iowa, on the brief), for plaintiff in error.

C. M. Stilwill, of Sioux City, Iowa (D. C. Shull, F. E. Gill, and J. U. Sammis, all of Sioux City, Iowa, on the brief), for defendant in error.

Before SANBORN and SMITH, Circuit Judges, and AMIDON, District Judge.

SANBORN, Circuit Judge (after stating the facts as above). [1, 2] The judgment in this case is challenged on the grounds that the court's thirty-second and thirty-third findings of fact should be disregarded, because they are not findings of ultimate facts, and are not sustained by the agreed facts and the evidence, and that the court's findings of fact are insufficient to support the judgment. But repeated perusals of all the findings of fact and all the evidence in this case leave no doubt that findings 32 and 33 are findings of ultimate and material facts, which the court was empowered by the acts of Congress and by the stipulation of the parties to deduce from the agreed facts and the evidence, and to make. Whether or not they are supported by the agreed facts and the evidence is the question whether or not they are sustained by the weight of the evidence, and that is a question of fact, which, in a trial of an action at law by the court, as in the trial of such an action by a jury, the national courts are forbidden by the Constitution and the law to review. Seventh Amendment to the Constitution; Rev. Stat. U. S. §§ 649, 700 (Comp. St. 1916, §§ 1587, 1668); Barnsdall v. Waltemeyer, 142 Fed. 415, 417, 73 C. C. A. 515, 517.

[3] The only matter invoking the relation of the admissible evidence to the findings of fact of the court in an action at law that is reviewable by a federal appellate court is the question of law whether or not there was any substantial evidence to sustain the findings, and that question may be reviewed only when by motion, objection, request for a declaration of law, or some like action, that special issue has been presented to and decided by the trial court, and an exception to its ruling has been taken and allowed, before the trial is concluded. No such motion, objection, or request was made in the court below, that court consequently made no ruling upon it, and no exception was taken to any such ruling, and the question of law whether or not there was any substantial evidence in the stipulation of facts and the testimony to sustain any of the findings of fact is not here for review. U. S. Fidelity & Guaranty Co. v. Bd. of Comm'rs, 145 Fed. 144, 150, 151, 76 C. C. A. 114, 120, 121, and cases there cited; Wear v. Imperial Window Glass Co., 224 Fed. 60, 63, 139 C. C. A. 622, 625; Felker v. First National Bank, 196 Fed. 200, 202, 116 C. C. A. 32, 34. Moreover, if that question had been presented, the agreed facts and the evidence would have compelled the conclusion that there was therein substantial evidence of the facts found in findings 32 and 33. Those findings, therefore, may not be set aside or disregarded.

It is contended that the findings of fact are insufficient to support the judgment, because under the facts found (1) the deposit by the Imple-

ment Company with the Security Bank of the 4 checks of the Michigan Company, aggregating $33,389.38, and the crediting of that amount by the bank to the account of the Implement Company subject to its checks on July 30, 1913, was not an absolute credit, but a credit on condition that the Michigan Company's checks should be paid in the regular course of business; (2) that the presentation to the Security Bank by the Implement Company of its check on that bank, payable to that bank, for $20,818.15, the acceptance by that bank of that check, and its charge of the amount of it to the account of the Implement Company, its payment of the 4 notes of the Implement Company owned by the plaintiff, which the Security Bank held for collection, its stamping of those notes paid, its surrender of them to their maker, and its sending to the plaintiff of its draft for the proceeds thereof, less its commission for collection, on August 1, 1913, did not constitute an absolute payment of the notes, or remittance of their proceeds, but left that payment and remittance subject to revocation at the will of the Security Bank in case the 4 checks of the Michigan Company were not paid; and (3) that, as the checks of the Michigan Company were not paid, the Security Bank rightfully revoked the payment of the notes, and the execution and delivery of its draft, and is not liable thereon. In support of these propositions counsel cite, and the court has carefully read and thoughtfully considered, Bellevue Bank v. Security National Bank, 168 Iowa, 707, 150 N. W. 1076; Inter-State National Bank v. Ringo, 72 Kan. 116, 122, 83 Pac. 119, 3 L. R. A. (N. S.) 1179, 115 Am. St Rep. 176; Merchants' National Bank v. National Bank of the Commonwealth, 139 Mass. 513, 2 N. E. 89; Steinhart v. National Bank, 94 Cal. 362, 29 Pac. 717, 28 Am. St. Rep. 132; Second National Bank v. Cummings, 89 Tenn. 609, 18 S. W. 115, 118, 24 Am. St. Rep. 618; St. Louis & San Francisco Ry. Co. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390, 33 L. Ed. 683; Goshorn v. Murray (D. C.) 197 Fed. 407; Stapylton v. Cie des Phosphates de France, 88 Fed. 53, 31 C. C. A. 383; City of Somerville v. Beal (C. C.) 49 Fed. 790; Beal v. City of Somerville, 50 Fed. 647, 1 C. C. A. 598, 17 L. R. A. 291; Griffin v. Erskine, 131 Iowa, 444, 109 N. W. 13, 9 Ann. Cas. 1193; Dille v. White, 132 Iowa, 327, 332, 109 N. W. 909, 10 L. R. A. (N. S.) 510; Blake v. Hamilton Dime Savings Bank Co., 79 Ohio St. 189, 87 N. E. 73, 74, 20 L. R. A. (N. S.) 290, 128 Am. St. Rep. 684, 16 Ann. Cas. 210.

The opinions in the first four cases and in some of the others cited tend strongly to sustain the propositions of counsel, but a searching examination and consideration of the decisions of the Supreme Court of the United States and of many other courts has convinced that those opinions are based upon views of the commercial law at variance with those of the Supreme Court, which are in themselves controlling in this court, and which, in our opinion, are sustained by the more convincing reasons and the greater weight of authority. The issues of law which condition the decision of this case are questions of commercial law, upon which the decisions of the state courts, while always persuasive, instructive, and respected, are not conclusive; for it is not only the privilege, but the duty, of the national courts, imposed upon them by the Constitution and the statutes of the United States, to consider for themselves and to form their independent opinions and decisions upon

questions of commercial or general law presented in cases of which they have jurisdiction, and it is a duty which they cannot justly renounce or disregard. Railroad Co. v. Lockwood, 17 Wall. 357, 368, 21 L. Ed. 627; Carpenter v. Providence Washington Ins. Co., 16 Pet. 495, 511, 10 L. Ed. 1044; Burgess v. Seligman, 107 U. S. 20, 33, 2 Sup. Ct. 10, 27 L. Ed. 359; Independent School Dist. v. Rew, 111 Fed. 1, 11, 49 C. C. A. 198, 208, 55 L. R. A. 364, and cases there cited. The consideration of the questions of law and fact at issue in this case and the decisions of the courts has led to these conclusions:

[4] A depositor and his depository bank may make a valid agreement that checks and drafts on other banks, which he deposits and the bank places to his credit, shall immediately become the absolute property of the bank, or that the bank shall hold them and continue the credit to him for them only on condition that they are paid in the regular course of business.

[5] But a customer of a bank, who deposits checks or drafts upon other banks with his bank, which gives him credit therefor in his general account, which is subject to check, thereby transfers the title to the checks or drafts to the bank, and renders it his debtor to the amount credited to him therefor, in the absence of an agreement to the contrary.

[6] The fact that the 4 checks of the Michigan Company for $33,-389.38 were accepted and placed by the Security Bank to the credit of the Implement Company, subject to its check, when it had less than $3,000 to its credit, without any special agreement that they should not become the property of the bank, and that the Implement Company should not check against them, until they were paid, and the fact that before they were dishonored the bank honored the checks of the Implement Company against this credit to the amount of more than $25,000, paid the Implement Company's notes with the proceeds of these checks, and canceled and surrendered that company's notes to their maker, convinces that, notwithstanding the testimony of the bank officers to a contrary intention, the 4 checks, immediately upon their acceptance and the crediting of them, became the absolute property of the bank, and the bank became the debtor of the Implement Company for their amount.

[7] A bank, which honors and pays a note, draft, or check of one of its customers upon his order, in the mistaken belief that the credit balance of that customer is larger than it in fact is, or in the futile hope or mistaken belief that checks or notes which the bank has credited to the account of that customer will be paid in the regular course of business, is estopped, as against the owner of such paid note, check, or draft, from revoking or avoiding such payment on account of such mistake or futile hope: (1) Because of the intolerable delay, uncertainty, and confusion that would result in commercial transactions, if the validity of such payments were to remain in doubt until such possible mistakes should be discovered and corrected; (2) because such a bank may know the state of its own accounts, and it can make such mistakes only through its own laxity or negligence, or its own assumption of the risk of future payments; and (3) because the owner of

the note, check, or draft has no means of knowing the state of the customer's account.

[3] The acceptance of the check of the Implement Company on and to the Security Bank for $20,818.15, the charge of that amount by the bank to the Implement Company's account, its stamping of the 4 notes owned by the plaintiff "Paid," its surrender of those notes to their maker, the Implement Company, and the making and mailing of its draft, to the order of the plaintiff, to the plaintiff for the proceeds of the notes, less the bank's commission for their collection, by the bank on August 1, 1913, constituted an absolute payment of the 4 notes, which, as against the plaintiff, it could not revoke, and made it legally liable to pay its draft.

[9] When a bank at which promissory notes are payable accepts an agency from the owner to collect them, it is bound to secure and preserve to him every right and privilege he would have had, if another bank or party in his city or town had accepted, and with reasonable diligence performed, the duty of such an agent. If the plaintiff had employed another bank or party at Sioux City as its agent to collect its notes, that bank, if it had acted with reasonable diligence, would have collected and received payment of the notes in the forenoon of August 1, 1913, as other banks that held such notes did, and would have issued and mailed its draft to the plaintiff for the proceeds of those notes, and the Security Bank is in no better condition to defeat an action upon its draft than such other bank or party would have been to have defeated an action upon its draft under such circumstances.

The reasons for these conclusions and the authorities which sustain them are so clearly and cogently presented in the memorandum opinion of Judge Booth, who tried this case, that further discussion is pretermitted, and that opinion is unanimously adopted as the opinion of this court. The following authorities, in addition to those cited by Judge Booth, sustain our conclusions: In re State Bank, 56 Minn. 119, 57 N. W. 336, 45 Am. St. Rep. 454; Bryan v. First National Bank of McKees Rocks, 205 Pa. 7, 54 Atl. 480, 482; Canterbury v. Bank, 91 Wis. 53, 64 N. W. 311, 30 L. R. A. 845, 51 Am. St. Rep. 870. The judgment below must be, and it is, affirmed. Judge Booth's memorandum opinion reads as follows:

"The conclusions stated in the decision filed in this case have been reached with a good deal of reluctance, because the Supreme Court of Iowa has reached diametrically opposite conclusions upon a state of facts substantially the same as those in the instant case. See Bellevue Bank v. Security National Bank [168 Iowa, 707], 150 N. W. 1076, and the opinions of that court are entitled to the highest deference and respect. In matters of general commercial law, however, the federal courts are not bound by the decisions of the state courts, but, while giving to state decisions due and careful consideration, must exercise an independent judgment, when called upon so to do. The decision in the Bellevue Bank Case, supra, does not seem to me to be in harmony with the principles of general commercial law announced in the decisions of the Supreme Court of the United States, by which decisions this court is of course bound, nor in harmony, in my judgment, with the best considered opinions of many other courts, both federal and state. I shall therefore briefly indicate the principles which in my opinion are decisive of the issues in the case at bar and lead to the conclusions reached in the findings.

"1. When money or a check is taken to a bank by a customer and deposited therein, and the bank receives the money or check and places it to the credit of the customer, in the absence of a special agreement between them to the contrary, the relation of debtor and creditor exists between the parties, and not that of bailor and bailee, or of principal and agent. Marine Bank v. Fulton Bank, 69 U. S. [2 Wall.] 252 [17 L. Ed. 785]; Thompson v. Riggs, 72 U. S. [5 Wall.] 663 [18 L. Ed. 704]; Scammon v. Kimball, 92 U. S. 362 [23 L. Ed. 483]; National Bank v. Burkhardt, 100 U. S. 686 [25 L. Ed. 766]; Davis v. Elmira Savings Bank, 161 U. S. 275 [16 Sup. Ct. 502, 40 L. Ed. 700]; Burton v. United States, 196 U. S. 283 [25 Sup. Ct. 243, 49 L. Ed. 482]; American Nat. Bank v. Miller, 229 U. S. 517 [33 Sup. Ct. 883, 57 L. Ed. 1310].

"In Marine Bank v. Fulton Bank, the Marine Bank had collected two notes for the Fulton Bank, and received payment in currency. Under the instructions, the Marine Bank placed the amount collected to the credit of the Fulton Bank. Later, when the particular currency which had been taken in payment had depreciated, the Marine Bank took the position that it had acted merely as the agent of the Fulton Bank and could not be held responsible for the depreciation of the currency. It was held, however, that in placing the proceeds of the collection to the credit of the Fulton Bank the Marine Bank had become the debtor of the Fulton Bank, and was no longer holding the money as agent, and that therefore the depreciation in the currency should fall upon the Marine Bank. The court, in speaking of the relation between the two banks, after the money had been received, said: 'It would be a waste of argument to prove that this was a debtor and creditor relation.'

"In Thompson v. Riggs, where a deposit had been made partly in bills and partly in coin, the depositor took the position that he was entitled to receive the deposit in kind. The court, however, held, reaffirming the rule laid down in Marine Bank v. Fulton Bank, that the relation of debtor and creditor existed, and that there was no special bailment. In its opinion the court said: 'Where the deposit is general, and there is no special agreement proved, the title of the money deposited, whatever it may be, passes to the bank, and the transaction is unaffected by the character of the money in which the deposit was made, and the bank becomes liable for the amount as a debt, which can only be discharged by such money as is by law a legal tender.'

"In Scammon v. Kimball the rule is again affirmed. In this case it was sought to maintain the position that the deposit was a special trust fund. The court, in holding to the contrary, used the following language: 'Deposits undoubtedly may be made with a banker under circumstances where the legal conclusion would be, that the title to the fund deposited remained in the depositor, and in that case the banker would become the bailee of the depositor, and the latter might rightfully demand the identical money deposited as his property; but where the deposit is general, and there is no special agreement proved inconsistent with such a theory, the title to the money deposited, whatever it may be, passes to the banker, and he becomes liable for the amount as a debt, which can only be discharged by a legal payment of the amount.'

"In National Bank v. Burkhardt this same rule was held to apply to the deposit of a check. In this case the bank was seeking to hold the defendant (under a written instrument) as a guarantor of a drawer of a check. The decision of the case turned upon the question whether the check had been offered by the drawee at the bank as a deposit, and received as such by the banker. The court in its opinion made the following quotation from Morse on Banking: 'But if, at the time the holder hands in the check, he demands to have it placed to his credit, and is informed that it shall be done, or if he holds any other species of conversation which practically amounts to demanding and receiving a promise of a transfer of credit, as equivalent to an actual payment, the effect will be the same as if he had received his money in cash, and the bank's indebtedness to him for the amount will be equally fixed and irrevocable.' The court then says: 'We regard this as a sound and accurate exposition of the law upon the subject, and it rests upon a solid basis of reason. * * * When a check on itself is offered to a bank as a deposit, the bank has the option to accept or reject it, or to receive it upon such

conditions as may be agreed upon. If it be rejected, there is no room for any doubt or question between the parties. If, on the other hand, the check is offered as a deposit and received as a deposit, there being no fraud and the check genuine, the parties are no less bound and concluded than in the former case. Neither can disavow or repudiate what has been done. The case is simply one of an executed contract. There are the requisite parties, the requisite consideration, and the requisite concurrence and assent of the minds of those concerned. It was well said by an eminent Chief Justice: "If there has ever been a doubt on this point, there should be none hereafter." Oddie v. National City Bank of New York, 45 N. Y. 735 [6 Am. Rep. 160].'

"In Davis v. Elmira Savings Bank the rule was again affirmed and applied. In that case it was sought to give the deposit a special character by reason of a state statute of the state of New York.

"In Burton v. United States the same rule was again affirmed, and in reference to a check drawn on a bank other than the bank wherein it was deposited. The question in that case arose whether, where the payee of a check which had been drawn upon a bank in St. Louis and sent to the payee in Washington, D. C., and there deposited by him in his bank and credited to his account, he 'received payment' of the check in Washington or in St. Louis. The court in its opinion uses the following language: 'When a check is taken to a bank, and the bank receives it and places the amount to the credit of a customer, the relation of creditor and debtor between them subsists, and it is not that of principal and agent'—citing cases supra. Again the court further said: 'In the case at bar the proof was not disputed. The checks were passed to the credit of defendant unconditionally, and without any special understanding. The custom of the bank to forward such checks for collection is a plain custom to forward for collection for itself. The only liability of defendant was on his indorsement. All this made a payment at Washington.'

"In American National Bank v. Miller a check had been given by one Plant to the First National Bank of Macon, drawn upon a Nashville bank. The Macon bank sent the check to the Nashville bank, with instructions to place it to its credit, and this was done. The Nashville bank later learned of the insolvency of Plant, canceled the credit to the Macon bank, and claimed the right of set-off as against Plant's account. Action was brought by the agent of the Macon bank against the Nashville bank. In this case it was contended by counsel that, the Nashville bank 'having acted under mistake of fact, that bank had the right as between itself and the bankrupt, or any one standing in his shoes, to revoke the book entries and make the set-off. The Nashville bank also had the right, as between itself and the First National, to revoke the book entries on the ground of mistake. The latter bank having given no value for the check and suffered no injury by its reception, the equities of the former were superior.' The court, however, held that a recovery could be had against the Nashville bank, and in its opinion used the following language: 'There are some disadvantages of sending a check for collection directly to the bank on which it is drawn, but when such bank performs the dual function of collecting and crediting, the transaction is closed and, in the absence of fraud or mutual mistake, is equivalent to payment in usual course. National Bank v. Burkhardt, 100 U. S. 686, 689 [25 L. Ed. 766]. In the present case it was as though an officer of the Macon bank had presented the check to the teller of the Nashville bank, and on receiving the money had paid it back over the counter for deposit to the credit of the Macon bank.'

"The following state authorities are to the same effect: Oddie v. Bank, 45 N. Y. 735 [6 Am. Rep. 160]; Met. Nat. Bank v. Loyd, 90 N. Y. 550; Cragie v. Hadley, 99 N. Y. 131 [1 N. E. 537, 52 Am. Rep. 9], cited with approval in Burton v. United States; Taft v. Bank, 172 Mass. 363 [52 N. E. 387], cited with approval in Burton v. United States; Nineteenth Ward Bank v. First Nat. Bank 'Weymouth, 184 Mass. 49 [67 N. E. 670]; Wasson v. Lamb [120 Ind. 514], 22 N. E. 729 [6 L. R. A. 191, 16 Am. St. Rep. 342]; Smith Roofing Co. v. Mitchell [117 Ga. 772], 45 S. E. 47 [97 Am. St. Rep. 217]; Plumas County Bank v. Bank of Rideout & Co. [165 Cal. 126], 131 Pac. 360 [47 L. R. A. 552]; Bryan v. Bank [205 Pa. 7], 54 Atl. 480; Nat. Bank v. Am. Ex. Bank [151 Mo.

320], 52 S. W. 265 [74 Am. St. Rep. 527]; Bartley v. State, 53 Neb. 310 [73 N. W. 744].

"In the present case no special agreement between the parties to the contrary of the general rule is shown. It is true testimony was offered tending to show that the defendant bank's officers, in receiving the four checks from the Western Implement Company and placing the same to the credit of that company on the books of the bank, did not intend actually to extend credit to the Western Implement Company. Conceding, without deciding, that the testimony so offered is admissible, it is certainly not conclusive, and in the present case not persuasive. This is a case where actions speak louder than words. 'Tell me,' said Lord Sugden, 'what you have done under a deed, and I will tell you what the deed means.' This remark of the Lord Chancellor has come to be accepted as a maxim in the construction of contracts, and applies, not only to express and written contracts, but also to implied and unwritten contracts. Let us apply this maxim, and inquire what were the acts of the parties, in the present case, which gave their own contemporaneous construction to their contractual relations at the time in question. They are as follows:

"The four checks sent by the Michigan Buggy Company to the Western Implement Company, and deposited by the latter company in the defendant bank, were placed to the credit of the Western Implement Company by the defendant bank upon its books. Said checks were indorsed by the defendant bank as if owner of the same, and no restrictions were contained in said indorsements. The defendant bank allowed the Western Implement Company to draw checks ad libitum against the deposit so made. The defendant bank itself received a check so drawn by the Western Implement Company and payable to the defendant bank. The defendant bank placed such check to the debit of the Western Implement Company on the books of the bank. The defendant bank thereupon marked the notes of the plaintiff 'Paid,' and delivered them to the Western Implement Company. The defendant bank drew its draft upon its Chicago correspondent, and sent said draft to the plaintiff as the proceeds of the notes collected, less commissions earned and retained. The defendant bank, immediately on learning of the dishonor of the checks deposited, commenced action thereon against the Michigan Buggy Company and the Western Implement Company. Any of these acts might, perhaps, if standing alone, be held not conclusive as to the relation existing between the Western Implement Company and the defendant bank after the deposit of the four checks above mentioned on the 30th day of July, and not inconsistent with the claim that the relation of principal and agent, and not that of debtor and creditor, was created by said deposit. But, when the acts above mentioned are considered all together as acts of ordinary routine transaction, the conclusion, to my mind, is then irresistible that the relation of debtor and creditor, and not that of principal and agent, was created, and that this was so understood and intended by the parties at the time.

"In reaching this conclusion, the notice contained on the inside of the cover of the passbook of the Western Implement Company has not been overlooked. That notice, however, when rightly construed, does not change the relation between the parties, the depositor and the bank, nor affect the ownership of the checks deposited. It simply gives rise, in connection with general commercial custom and the course of business between the parties, to a contract between them, that in case the checks deposited and credited upon the account of the Western Implement Company should not be paid by the drawer, the depositor would repay the bank the amount of said checks. First Nat. Bank v. Armstrong (C. C.) 39 Fed. 231; Plumas County Bank v. Bank of Rideout [165 Cal. 126, 131 Pac. 360], 47 L. R. A. (N. S.) 552. If by any possibility further effect could be given to the words of the notice in the passbook, such effect was waived by the conduct of the parties. Jefferson Bank v. Merchants' Refrig. Co., 236 Mo. 407 [139 S. W. 545].

"2. When a check drawn by a customer of the bank upon said bank is presented at the bank and honored, either by being paid in cash and charged against the account of the drawer on the books of the bank and canceled, or by being placed to the credit of the payee and charged against the account of

the drawer on the books of the bank and the check canceled, in the absence of fraud or mutual mistake the transaction is closed. See cases cited supra, and especially Am. Nat. Bank v. Miller, 229 U. S. 517 [33 Sup. Ct. 883, 57 L. Ed. 1310]; Riverside Bank v. First National Bank, 74 Fed. 276 [20 C. C. A. 181] (cited with approval in Bradley Lumber Co. v. Bradley County Bank, 206 Fed. 41 [124 C. C. A. 175] C. C. A. 8); Montgomery County v. Cochran, 121 Fed. 17 [57 C. C. A. 261]; same case, 126 Fed. 456 [62 C. C. A. 70].

"In the present case the Western Implement Company on August 1, 1913, drew its check on the defendant bank for $20,818.15, payable to the order of the defendant bank, and delivered the same to the defendant bank. The defendant bank received said check, honored the same, charged the account of the Western Implement Company with the amount of the check, and delivered to the Western Implement Company promissory notes held by the bank for collection, including the notes sent by the plaintiff, aggregating the amount of said check, first stamping said notes 'Paid.' That transaction, as between the Western Implement Company and the defendant bank, was thereupon closed on the books of the defendant bank. The defendant bank then drew its own draft (the one in suit) on the Continental & Commercial National Bank of Chicago, payable to the plaintiff, and mailed said draft to the plaintiff; the amount of the draft being the amount due upon the notes sent by plaintiff for collection, less the commissions for collection. This transaction between the plaintiff and the defendant was thereupon closed.

"The net result of these transactions was that the Western Implement Company had delivered to the defendant bank the check in payment of the notes held by the bank for collection. The check had been received and honored by the bank, the notes paid, and the indebtedness of the bank to the Western Implement Company reduced by that amount; and the defendant bank became liable to the plaintiff for the amount of the notes which the plaintiff had sent for collection, which liability defendant bank undertook to liquidate by sending to plaintiff the draft in suit.

"3. There was no fraud shown by the record in this case, and the mistake claimed was not such as to entitle the bank to recall the draft sent to plaintiff. It is suggested that the scheme pursued by the Western Implement Company and the Michigan Buggy Company was a legal fraud upon the defendant bank; that as to them the defendant bank had the right to retrace its steps and cancel the several transactions; and, inasmuch as the plaintiff's notes were in fact worthless when sent for collection, the plaintiff ought not to stand in the way. Just what is meant by the expression that 'the scheme pursued was a legal fraud' upon the defendant bank is not made clear. No actual fraud is disclosed by the record, or is claimed to be disclosed. It is true that the record discloses that the Michigan Buggy Company was floating a large amount of accommodation paper, and that the Western Implement Company was the maker of a considerable part of this. But this of itself does not amount to fraud of any description. It is also true that the record shows that the Michigan Buggy Company was insolvent at the time when it drew the four checks which were sent to the Western Implement Company and deposited in the defendant bank, and that the Western Implement Company, by reason of its liability on the accommodation paper, was also insolvent. But these facts do not amount to fraud. There is nothing in the record that shows knowledge of the insolvency of the Michigan Buggy Company on the part of either the Michigan Buggy Company or the Western Implement Company at the time the four checks in question were sent to the Western Implement Company and deposited in the defendant bank; but there is a stipulation of fact that the Western Implement Company had no such knowledge. Nor is there any showing or suggestion in the record that the Michigan Buggy Company knew that the four checks sent by it to the Western Implement Company would not be paid by the drawee. The bare facts which are disclosed by the record may be consistent with a scheme to defraud on the part of the Michigan Buggy Company, but they may be consistent with an honest purpose on its part.

"It is immaterial here, however, which view is taken, for it is conceded in the record that the plaintiff had no knowledge of any wrongful acts, if there

were such, by either the Michigan Buggy Company or the Western Implement Company, or that either of said companies was insolvent. Nor was there any such mistake on the part of defendant bank in the several transactions as would give it the right to retrace the steps it had already taken, and demand back from plaintiff the draft sued upon as money paid under mistake of fact. It is not claimed that there was any mutual mistake of fact by plaintiff and defendant.

"But conceding, while not deciding, that this would not be necessary, and that a mistake of fact on the part of defendant bank alone would be sufficient, let us see what the mistake was. This is nowhere stated very distinctly by counsel for defendant, but perhaps a fair statement of defendant's position would be this: 'That it mailed the draft in good faith, in the reasonable belief that the conditional credit to the Western Implement Company had become absolute by the honor of the checks' of the Michigan Buggy Company, and that this was a mistake of fact. This contention, when reduced to its simplest terms, means that defendant bank made a mistake as to the condition of the account of the Western Implement Company on the books of the bank.

"But this is not such a mistake as would allow the bank to retrace its steps. Am. Nat. Bank v. Miller, 229 U. S. 517 [33 Sup. Ct. 883, 57 L. Ed. 1310]; Riverside Bank v. First Nat. Bank, 74 Fed. 276 [20 C. C. A. 181]; Bradley Lbr. Co. v. Bradley Bank (C. C. A. 8) 206 Fed. 41, 46 [124 C. C. A. 175]; Nineteenth Ward Bk. v. First Nat. Bank [184 Mass. 49], 67 N. E. 670; Boylston Bank v. Richardson, 101 Mass. 287; Penacock Bank v. Hubbard, 58 N. H. 167; First Nat. Bank v. Devenish [15 Colo. 229], 25 Pac. 177 [22 Am. St. Rep. 394]; Citizens' Bank v. Schwarzchild, 109 Va. 539 [64 S. E. 954, 23 L. R. A. (N. S.) 1092]; Nat. Bank of Comm. v. Am. Ex. Bank [151 Mo. 320], 52 S. W. 265 [74 Am. St. Rep. 527]. In truth, however, there was no such mistake of fact as claimed. As has already been pointed out, the bank by its acts deliberately assumed the relation of unconditional debtor to the Western Implement Company, and there was no room for the alleged mistake, because there was no conditional credit in the transaction.

"4. It is claimed, however, that the defendant bank was acting as plaintiff's agent in collection of the notes in question, and cannot be held liable upon the draft sued upon, unless the defendant bank was guilty of some violation of duty as such agent which resulted in loss to the plaintiff bank. The truth contained in this claim is but half a truth. The fallacy of the position lies in the fact that the whole situation is not disclosed by the statement thus made. It is true that the defendant bank was the agent of the plaintiff during a part of the period covered by the transactions in question, but it was more than this. Independent of any relationship between itself and the plaintiff, or of any transaction between them, the defendant was a bank and doing business as such. At its counter were payable certain notes made by the Western Implement Company, a customer of the defendant bank. In analyzing the transactions involved in this case, this dual relationship of the defendant bank must be kept in mind; to demonstrate clearly what acts were performed by the defendant in one capacity, and what in the other capacity, we have but to look at other similar transactions which were being carried on by the defendant bank at the same time in reference to other similar notes made by the Western Implement Company. These transactions are disclosed by the admitted facts in the present case.

"A note similar to the four notes involved in the case at bar, made by the Western Implement Company and indorsed by the Michigan Buggy Company, payable at the defendant bank August 1, 1913, was on the 1st day of August, 1913, in the hands of the Northwestern National Bank of Sioux City, Iowa, for collection. What was done as to payment: The Western Implement Company drew its check upon the defendant bank, upon the same account which is involved in the present case (the account to which were credited the four checks sent to the Western Implement Company, by the Michigan Buggy Company). This check so drawn by the Western Implement Company in favor of the Northwestern National Bank of Sioux City was presented by the last-named bank to the defendant bank through the clearing house for

payment, and by the defendant was paid out of said account. This particular transaction was thus closed as between the defendant bank and collecting bank. The defendant bank in this transaction was certainly not acting as agent for the owner of the note which was thus collected. The defendant bank had done in that transaction the following acts: (1) It had honored and paid to the drawee the check of its customer the Western Implement Company, drawn for the payment of the promissory note held for collection by the Northwestern National Bank, the drawee of the check. (2) It had charged to the Western Implement Company's account upon the books of the defendant bank the amount of the check so paid. (3) It had credited itself in its Western Implement Company's account with the amount so paid on the check, and thereby reduced its indebtedness to the Western Implement Company by so much.

"Two similar notes were paid in the same manner to the other banks holding them for collection. Precisely the same three acts were performed by the defendant bank with respect to the payment of the notes of the plaintiff bank: (1) The defendant bank had honored and paid to the drawee (itself) the check of its customer, the Western Implement Company, drawn for the payment of the promissory notes held for collection by the drawee of the check. (2) It had charged to the Western Implement Company's account the amount of the check so paid. (3) It had credited itself in its Western Implement Company's account with the amount so paid on the check, and thereby reduced its indebtedness to the Western Implement Company by so much. In no one of these three acts was defendant bank agent of plaintiff.

"On the other hand, it was agent of plaintiff in the following acts: (1) In demanding payment of the notes sent by plaintiff for collection. (2) In receiving from itself as bank so much of the proceeds of the Western Implement Company's check for $20,818.15, which it as bank had honored, as was necessary to pay plaintiff's notes. (3) In stamping the notes of the plaintiff 'Paid.' (4) In procuring from itself as bank a draft payable to plaintiff to cover amount of notes collected less commission for collection. (5) In transmitting to plaintiff the draft thus procured.

"But plaintiff does not claim that defendant was negligent in performing these acts as agent. Negligence is not the gist of plaintiff's complaint, and the case is not governed by the principles of the law of negligence as between principal and agent, because those principles are not applicable to the facts. Defendant, as plaintiff's agent, collected the notes owned by plaintiff and made remittance by draft, but now seeks to recall the remittance because it (not as plaintiff's agent, but in an entirely different capacity) had entered into an independent transaction with the maker of the notes, which enabled the maker to pay the notes, but which independent transaction turned out to be an unfortunate one for the defendant bank.

"The value of the principles of commercial law depends largely upon their certainty. If the test of the applicability and application of these principles is to be made dependent upon ·relative gain or loss of the parties to a given transaction, uncertainty would take the place of certainty, and the value of supposedly established principles would be very largely destroyed. The oft-quoted words of Judge Cooley in the case of First Nat. Bank v. Burkham, 32 Mich. 328, would seem to be here applicable: 'The beauty and value of the rules governing commercial paper consist in their perfect certainty and reliability; they would be more than useless if the ultimate responsibility for such paper, as between payee and drawee, both acting in good faith, could be made to depend on the motives which influenced the latter to honor the paper.' I am aware that there are decisions holding to the contrary of the views expressed above, but I am unable to harmonize those decisions with the principles applicable to the case at bar, as laid down by the courts whose decisions this court is bound to follow."